IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

PATRICK J. FITZGERALD,

                      Plaintiff,

        v.

JAMES GREER, Health Services Administration WDOC;
THOMAS EDWARDS, R.N.;
TIMOTHY CORRELL, M.D., Dodge Correctional Institution;
DEB LEMKE, M.D., Oshkosh Correctional Institution;
ROMAN Y. KAPLAN, Health Services Unit, WDOC/OSCI;
NANCY BOWENS, A.P.N.P., WDOC/OSCI;
JENNIFER DELVAUX, Inmate Complaint Examiner, WDOC/OSCI,
PATRICIA VOERMANS, Health Care Coordinator, Wisconsin
Department of Corrections; and WILLIAM POLLARD, Warden,
Green Bay Correctional Institution,

                      Defendants.

OPINION AND ORDER

07-cv-61-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      Plaintiff Patrick J. Fitzgerald brought this civil action against defendants, who are all employees of the Wisconsin Department of Corrections, alleging that they had been deliberately indifferent to his serious medical needs in violation of his rights under the Eighth Amendment to the United States Constitution.  Plaintiff alleged that in the fall of 2003, he had been ejected from his car after it rolled over at a high rate speed and had

1

suffered fractures in his spine, collapsed lungs, shattered front teeth, multiple rib fractures, a complete rotator cuff tear, snapped right hamstring, ruptured discs and a compacted spine, among other injuries.  Eighteen months later, he was sentenced to a term of imprisonment in the Department of Corrections where, he alleges, he has not received the medical care he needs for heart problems and the residual pain from the accident.

On his own behalf, plaintiff filed several motions for preliminary relief, seeking orders requiring defendants to provide him pain medication.  By the time a hearing was held on plaintiff's third motion, it became evident that plaintiff could not proceed with his suit without legal representation.  On June 21, 2007, Daniel Prince was appointed to represent plaintiff after Prince agreed to accept a pro bono appointment.  Mr. Prince's work in this case has been exemplary and in the best tradition of pro bono representation.

By counsel, defendant filed another motion for preliminary injunction.  A hearing on the motion was held on April 15, 2008.

A preliminary question arose at the outset of the hearing.  Defendants moved to dismiss the motion on the ground that plaintiff had failed to name as a defendant any official in a position to grant plaintiff's request for immediate relief in the form of the medication he wants for his chronic pain.  In his amended complaint, plaintiff named three physicians who had treated plaintiff in the past in other institutions but did not name his current treating physician or the department's medical director.  Plaintiff sued James Greer,

2

the director of the Bureau of Health Services, but defendants maintained that this does not solve plaintiff's problem because Greer is not a physician and would be unable to order medication for plaintiff.

After hearing argument on the issue, I determined that the hearing could go forward on the assumption that if any injunctive relief were ordered, defendant Greer would be responsible for overseeing compliance with the order.   (In plaintiff's first amended complaint, he sued William Pollard, the warden at the Green Bay Correctional Institution, where plaintiff was housed at the time.  Although plaintiff would be entitled to substitute the warden at Jackson Correctional Institution, where he is now housed, he has chosen not to do so but rather to dismiss Pollard from the suit.  That motion will be granted.)

It is a moot point now whether Greer is the proper official to carry out any order for preliminary relief because the evidence adduced at the hearing has convinced me that plaintiff cannot prove that defendants' refusal to provide him methadone or any other opiate is a violation of the Eighth Amendment.  It is unlikely that plaintiff suffers from severe pain and even if he does, he has not shown that the refusal of the defendant medical providers to prescribe opiates for him constitutes deliberate indifference.  Rather it appears that the physicians have sound medical reasons for their refusal.  Therefore, I find that plaintiff is not entitled to a preliminary injunction.

Contemporaneously with the preparations for the April preliminary injunction

3

hearing, the parties were briefing defendants' motion for summary judgment grounded on defendants' contention that defendants did not demonstrate deliberate indifference to plaintiff's serious medical needs and that plaintiff had not adduced sufficient proof to allow a jury to find otherwise. That motion has been fully briefed, making it possible to address both motions in this order. I find from the undisputed facts that no reasonable jury could find that defendants have been deliberately indifferent to plaintiff's serious medical needs. Therefore, defendants are entitled to summary judgment in their favor on plaintiff's complaint.

In setting out the facts, I will begin with those pertinent to the motion for summary judgment. They provide context for the facts developed at the preliminary injunction hearing. For the purpose of deciding the summary judgment motion, I find that the following facts are undisputed and material.

## UNDISPUTED FACTS

### A. Plaintiff

Plaintiff Patrick J. Fitzpatrick is an inmate in the custody of the Wisconsin Department of Corrections. Before he was incarcerated, he had been involved in a serious automobile accident on October 26, 2003, in which he sustained multiple injuries. He underwent months of physical, speech and occupational therapy.

Sixteen months after the accident, on February 28, 2005, plaintiff was arrested and taken into custody at the Green Lake County jail.  He remained there until April 2005, when he was convicted of driving while intoxicated (ninth offense) and sentenced to the Wisconsin Department of Corrections to serve a four-year sentence.  During the course of his sentence, plaintiff has been confined at a number of correctional institutions:  Dodge, Kettle Moraine, Oshkosh and Green Bay.  He is now at the Jackson Correctional Institution.

B. Relevant Members of the Department of Corrections' Medical Staff

1. Dodge Correctional Institution

Defendant Timothy Correll, M.D., is a staff physician with the Bureau of Health Services, working at the Dodge Correctional Institution, a maximum security institution. Waupun.  He is responsible for providing professional medical services to inmates in accordance with standards of practice in corrections and in the community and with Bureau of Health Services Policies, Procedures and Standards.  He has treated hundreds of patients for chronic pain of various types during his career.

Correll saw plaintiff for an examination on April 13, 2006, soon after plaintiff had arrived.  It is defendant Correll's practice to talk with an inmate about his medical history and then undertake a head-to-foot physical examination.  When he met with plaintiff, he did not have access to plaintiff's previous medical records but he had a Health Transfer

5

Summary that plaintiff had completed before the examination.  The form made no reference to any heart conditions, but plaintiff told Correll that he was taking heart medications.

Correll gained the impression from plaintiff that he had been HIV positive since 1993, that he had been treated in Milwaukee and at the University of Wisconsin hospital and that his treatment had ended when he was incarcerated in February 2004.  (It is likely that this date should be February 2005, which is when plaintiff was first incarcerated in the Green Lake County jail.).  Plaintiff reported his October 2003 automobile accident and long recovery at the UW hospital.  He told Correll that he continued to have a lot of pain as result of the accident and that the naprosyn he was taking was not helping.  He told Correll that he had pain in his muscles, arms, legs and across his shoulders, that his left rotator cuff was torn, that he had weakness in his left arm, that his whole body hurt, that he could not concentrate and that his pain kept him awake at night.

Correll wrote in his notes that plaintiff had disclosed a remote history of IV drug use and believed he had contracted HIV from his history of male-to-male sexual contact. (Plaintiff denies that he told Correll he had been HIV positive since 1993; he says he reported having had a false positive test for HIV.  In light of his statements at sentencing just days earlier to the effect that he was paying $11,000 a month for a medication "cocktail" to treat his HIV symptoms, his denial is unconvincing.  However, for the purpose of this order, I will assume that he told Correll what he now says he did.)   Correll ordered an

6

immunization for hepatitis A and a test for hepatitis C and prescribed amitryptyline, 50 milligrams at bedtime, for pain control. He did not see anything in the physical examination suggesting that plaintiff was experiencing significant chronic pain, such as obvious deformities, injuries or behaviors.

On April 15, 2005, Correll ordered double portions of meals and monthly nursing visits to plaintiff to monitor his conditions because of the potential for deterioration in patients with HIV and ordered plaintiff's placement on the chronic disease list. On April 19, as a part of his common practice for treating the complications that arise from HIV treatment, he ordered that plaintiff be allowed to wear sneakers instead of the state-issued work boots.

On April 25, 2005, defendant Correll was informed that plaintiff had six aliases. All six were checked with state laboratories; none had a record of a positive HIV test for plaintiff. The HIV tests Correll had ordered turned out to be negative. At that point, Correll rescinded his previous orders for sneakers, amitriplylin, double food portions, naprosyn and multivitamins; canceled the request for a UW Immunology Clinic Visit; and removed plaintiff from the Chronic Disease List. About that time, plaintiff argued with Correll about the discontinuation of his medications.

Correll never knew that plaintiff suffered significant pain from wearing work boots instead of sneakers. After plaintiff was transferred from the Dodge Correctional Institution

7

to Kettle Moraine on June 20, 2005, Correll had no responsibility for his medical care.

2. Oshkosh Correctional Institution

a. Roman Kaplan, M.D.

Defendant Roman Kaplan, M.D., is a physician licensed to practice medicine in Wisconsin. He received his medical degree in the Soviet Union in 1973 and has been licensed in Wisconsin since July 1994. At all relevant times, he has been employed by the Wisconsin Department of Corrections as a physician. He has extensive experience in the treatment and management of pain.

Plaintiff saw defendant Kaplan on January 5, 2006, at the Oshkosh Correctional Institution, after plaintiff's transfer from the Kettle Moraine Correctional Institution. Kaplan was filling in at Oshkosh that day; he was not the primary care physician. Kaplan saw plaintiff for a follow-up on various cardiology issues, two small skin lesions and a complaint of back and left shoulder pain. Kaplan assessed plaintiff as having a history of paroxysmal atrial fibrillation but concluded that plaintiff's examination was normal and his heartbeat was regular with no murmurs. He observed plaintiff enter the examination room without difficulty, sit down easily, get up on the examination table readily and leave the room with no difficulty. He appeared stable, talkative and active. Kaplan did not observe

8

any signs of physical stress or limitations on his movement.

Kaplan found that plaintiff had full to passive range of motion, a normal gait and decreased strength to abduction and external rotation in his left arm.  His neck was supple.  His Waddell's signs (tests used to distinguish organic pain from pain with no apparent organic source) were positive for two out of four and his deep tendon reflexes were two of four.  He complained of mild tenderness at C6-7 in response to a stress test but had no neurological signs.  Kaplan saw little to support any finding that plaintiff suffered from acute or chronic pain  He wrote "questionable need of methadone in the future, will provide accommodation for chronic neck/shoulder problem."

At the time of his examination, Kaplan knew that plaintiff was receiving as-needed doses of vicodin prescribed by a physician at Kettle Moraine.  Kaplan believed that it was inappropriate to use vicodin for long-term relief of pain because of the potential for serious harm to the patient, as well for abuse within the correctional setting.  Plaintiff's prescription for the maximum permitted dosage of vicodin raised concerns for Kaplan that plaintiff was abusing the medication.  Believing that plaintiff was drug dependent and having observed no limitation of movement, Kaplan wrote an order decreasing the dosage of vicodin to one pill a day for one week and none after that.  In Kaplan's opinion, this decrease was sufficiently gradual to prevent plaintiff from experiencing withdrawal symptoms.

Kaplan's general practice is to inform patients what can be done to accommodate

9

their pain and encourage them to try to relieve the pain without opioids.  He tells the patients what he will prescribe and how it should work.  He believed that plaintiff's exam and history supported treatment with a moderate dose of a nonsteroidal prescription such as ibuprofen, along with accommodations such as a lower bunk, mattress and soft pillow.

Kaplan placed an order for the lower bunk, mattress and extra pillow and prescribed one 800 milligram tablet of ibuprofen twice a day as needed, 60 tablets a month for one year.  Kaplan requested a Holter monitor report and a follow-up in three months for plaintiff's heart and dermatological condition.

Defendant Kaplan believes that all attempts should be made to wean inmates off opiates.  If that is not possible, it is better to use a long-acting opioid such as methadone, which has less potential for abuse and provides steadier pain control than a short-acting opioid that must be taken several times a day and tends to provide a kind of high rather than substantial pain relief.

b. Nancy Bowens

Defendant Nancy Bowens is a licensed registered nurse and a state-licensed advanced practice nurse prescriber.  She has been employed by the Department of Corrections as a licensed nurse practitioner at the Oshkosh Correctional Institution from 2001 to the present.

At the request of another health services nurse, defendant Bowens saw plaintiff on

10

January 25, 2006, for a lump on his buttock, which she treated.

On February 8, 2006, defendant Bowens had a follow-up appointment with plaintiff. Plaintiff told Bowens he had noted trace, intermittent amounts of deep red blood in his stool and gastrointestinal changes but no abdominal pain.  Bowens found plaintiff to be alert, oriented and in no acute distress.  His skin was warm and dry and the color was appropriate; an examination of his lungs, heart and abdomen was normal; and a test for hidden gastrointestinal bleeding was negative.

When plaintiff told Bowens that his father had died from colon cancer, she directed him to complete his medications as directed and to supply three consecutive stool samples for fecal occult blood testing.  Plaintiff made no complaints of pain resulting from his accident to Bowens during these examinations.  He did not tell her that ibuprofen irritated his stomach.

c. Defendant Deborah Lemke, M.D.

Defendant Deborah Lemke was employed at the Oshkosh Correctional Institution from May 30, 2006 until December 31, 2006.  As a Department of Corrections employee, defendant Lemke has the responsibility of attending to the medical needs of inmates, diagnosing and treating illnesses and injuries and arranging for professional consultation when warranted.

11

On April 17, 2006, defendant Lemke made notes to schedule a nuclear perfusion standing evaluation for plaintiff for reversible ischemia, obtain the results of a cardiac catheter results from the Berlin hospital for 2001, obtain a lipids panel and schedule a cardiology follow-up appointment in four to six weeks.  She did not see plaintiff that day but did see him on April 27, 2006, for complaints of diarrhea.  Plaintiff told her that he was HIV positive.  This information was relevant to her treatment of his diarrhea.  Plaintiff made no complaints of pain.

Defendant Lemke ordered various tests, including stool tests for viral and bacterial culture and a Hemoccult® test.  The Hemoccult  test was negative, indicating that plaintiff did not have occult blood in his stool; the stool tests were negative for bacteria.  Lemke prescribed imodium and metronidazole to treat the diarrhea.

Defendant Lemke ordered plaintiff's records from Milwaukee County Medical/Froedert Hospital because plaintiff told her he had undergone HIV treatment there.  The hospital responded with notes stating that plaintiff was HIV positive since 1992 and had been treated with the HIV cocktail until April 2005.  The notes did not mention any positive HIV test result and Lemke noted that his test in the Department of Corrections had been negative.  Additional records from Froedert Hospital showed that plaintiff had refused to have an HIV test done there.  According to the HIV hotline that Lemke called, it would be impossible for a person tested as HIV positive in the 1980s to test negative for HIV in

12

2006.

On September 8, 2006, defendant Lemke saw plaintiff at the request of defendant Thomas Edwards, the Oshkosh health services unit manager.  Plaintiff told Lemke of his alleged injuries and told her he had been prescribed narcotic pain medications previously. Lemke's notes reveal her concern about plaintiff's alleged need for pain treatment.  She noted that plaintiff had misrepresented his HIV status to medical personnel, his chart showed a history of alcohol and drug use and he had misrepresented the date of his automobile accident, telling her that it had occurred more recently than it had.  She noted that although plaintiff had said he had had a previous consultation with a pain management specialist, she did not see a report of any such consultation during her review of plaintiff's chart and the chart showed that plaintiff had received only perioperative narcotics, that is, for only the period around the time of a surgical operation.

Defendant Lemke's notes from September 8, 2006 show that plaintiff told her he had seen Dr. Damasco Ty in February 2005 and that she was unable to find any record of his having done so.  At the end of plaintiff's visit with her, Lemke told him she would look for his last pain clinic consultation and follow up with him in a few weeks.  She noted that he seemed agreeable to that resolution and that he "walked normally and in a relaxed manner" when he left.  Also at that visit, she discontinued his extra pillow.  She concluded that plaintiff was not in acute pain.  In her opinion, it would have been medically inappropriate

13

to treat plaintiff with narcotic pain medication on September 8, 2006.

On October 27, 2006, Lemke saw plaintiff for acute complaints of a "hot cyst" on his back. She diagnosed MRSA and implemented the MRSA protocol, which involved evaluation and isolation of any affected inmate. She placed plaintiff in an isolation cell with another inmate suspected of having a MRSA infection because no other isolation cells were available. (Plaintiff disputes this fact but has offered only his own statement in support, without explaining how he would have known whether other isolation cells were available.) Plaintiff's wound resolved and he was returned to his regular housing unit on October 30, 2006, without any final determination that he did or did not have MRSA. (The parties dispute whether Dr. Lemke said, "Let's see how he likes them apples," when plaintiff was taken to the isolation cell. The dispute is immaterial to any issue in this suit.)

d. Donna Larson

Donna Larson is a nurse in the health services unit at Oshkosh, who saw plaintiff on August 24, 2006, for complaints of pain in his left shoulder, neck and head. She noted that plaintiff was taking ibuprofen regularly, that he had no deformities, no points of tenderness and equal hand strength. She prescribed alternating a warm moist cloth and ice, 800 milligrams of ibuprofen with acetaminophen in between, muscle rub for sleep and an extra pillow for positioning. She ordered iperamide and Metamucil for diarrhea and a follow-up

14

by the physician for long-term pain control.

e. Thomas Edwards

At all relevant times, defendant Thomas Edwards was employed by the Department of Corrections as the Health Service Manager in the Health Services Unit at the Oshkosh Correctional Institution and provided medical services to inmates held in Wisconsin prisons. He is employed as a Nurse Clinician 2 at Oshkosh.

C. Other Visits by Plaintiff to Health Services Unit at Oshkosh

On July 24, 2006, plaintiff was seen by a health services unit staff member for complaints of severe, sudden-onset migraine headaches. At the time, he rated his pain as 11 on a 1-10 scale. He asked for an appointment with the advanced practitioner.

On September 5, 2006, plaintiff was seen by a nurse in the health services unit for complaints of increased pain with numbness in his lower extremities that was causing him to lose sleep and decrease his activity level. He complained of increased loose stools. The nurse noted that he walked into the room with no obvious distress and moved all extremities well with no sign of pain. He had no deformities in his spinal area. When the nurse checked with staff, she learned that he did not complain to them about any pain and that he spent a fair amount of time sleeping. The nurse ordered Metamucil and made an appointment to

15

follow up with a physician the next month.

D.  Non-medical Defendants

1. Defendant James Greer

Defendant James Greer is employed by the Department of Corrections as Director of the Bureau of Health Services within the Division of Correctional Programs.  His responsibilities include developing and implementing policies for delivery of health services, preparing budgets, directing staff and reviewing inmate complaints regarding health services.

2. Defendant Jennifer Delvaux

Defendant Jennifer Delvaux has been employed as an Institution Complaint Examiner at the Oshkosh Correctional Institution since September 2000; she has been employed at the institution since October 1995.  She is custodian of offender complaints filed by inmates while incarcerated at Oshkosh and she has access to records generated and maintained at the institution pertaining to the inmates housed there.

3. Defendant Patricia Voermans

Defendant Patricia Voermans was employed at all relevant times by the Department of Corrections, Bureau of Health Services, as Nursing Coordinator for Oshkosh, Oakhill

Correctional Institution, Fox Lake Correctional Institution and three juvenile facilities.  She retired from state service in January 2008.

### E. Inmate Complaint Review System

The Department of Corrections has an Inmate Complaint Review System that affords inmates a process for raising grievances.  Wis. Admin. Code §DOC 310.  Each complaint is investigated by an Inmate Complaint Examiner for recommendation of a decision and then forwarded to a reviewing authority for decision.

When an inmate files a complaint about a medical issue or medical treatment, the Inmate Complaint Examiner at the institution investigates the complaint by reviewing medical records and talking with the health services unit staff and then recommends a decision to the reviewing authority.  For medical issues, the reviewing authority is the nursing coordinator assigned to the institution in which the inmate is housed.  If the complainant is dissatisfied with the reviewing authority's decision, he may appeal to the Corrections Complaint Examiner, who will investigate and recommend a decision to the Secretary.  The Secretary may call on the Nursing Coordinator for information

### F. Plaintiff's Inmate Complaints

17

1. <u>Inmate (Offender) Complaint OSCI-2005-5007</u>

Plaintiff submitted Offender Complaint OSCI-2006-5007 on February 21, 2006, complaining of chronic pain resulting from his automobile accident and alleging that the Health Services Unit staff had done nothing for the pain.  On February 22, 2006, defendant Delvaux, Institution Complaint Examiner, investigated the complaint.  In consultation with defendant Bowens, she reviewed plaintiff's medical records, which showed the following: plaintiff had been treated with Vicodin from September 2005 until January 6, 2006, when orders were written to reduce and then discontinue the medicine.  He was prescribed 800 milligrams of ibuprofen, twice daily, for one year with a maximum of 60 a month.  On January 25, 2006, defendant Bowens had ordered ibuprofen for plaintiff in a daily amount of 400 milligrams for one week to treat an infection.  This prescription had the effect of revoking the previous one.

After defendant Delvaux discussed the issue with defendant Bowens, Bowens re-wrote the prescription for 800 milligrams of ibuprofen.  Plaintiff was scheduled to be seen for pain by the institution doctor in early April 2006.  Delvaux advised plaintiff to be patient and noted that he had been seen by the nurse practitioner since the order for ibuprofen had expired but had not raised any concerns with her.  She recommended no further action and dismissal of the complaint.  Defendant Voermans, the reviewing authority, accepted the recommendation and dismissed complaint OSCI-2006-5007 on February 23, 2006.

18

2. Complaint OSCI-2006-329

On or about December 30, 2005, plaintiff filed inmate complaint OSCI-2006-329, complaining that he had not seen a doctor on December 29, 2005, as scheduled, and saying that he needed medical attention desperately because his vicodin had become ineffective. (The parties have not said anything about the investigation of this complaint, but plaintiff was seen by Dr. Kaplan on January 5, 2006, as noted above.)

3. Complaint OSCI-2006-24012

On August 16, 2006, plaintiff submitted offender complaint OSCI-2006-24012, saying that "OSCI HSU refuses and totally disregards the fact that chronic pain is always present including deep and sharp pains in my left shoulder due to a complete rotator cuff tear as a result of a [motor vehicle accident]."  Plaintiff complained that he was receiving only 800 milligrams of ibuprofen and it "does not work."

Defendant Delvaux investigated the complaint and found that plaintiff had been seen by Nurse Larson on July 24, 2006, complaining of migraine headaches.  At the time, plaintiff had told Larson that the ibuprofen was ineffective and that he believed that his history of back problems was the root of his migraines; he did not complain of back pain.  Plaintiff had asked for a follow-up appointment with an advanced care practitioner for chronic pain; he was scheduled to see an advanced care practitioner but not until early October.  He was not

19

referred to a pain specialist at that time.

Defendant Delvaux told plaintiff that if his condition changed, he should submit a new request to the health services unit explaining why he needed to be seen.  She recommended dismissal of plaintiff's complaint OSCI-2006-24012.  Defendant Voermans accepted Delvaux's recommendation and dismissed plaintiff's complaint on September 5, 2006, after modifying it to say that plaintiff's complaints of pain should be addressed at his scheduled appointment with the practitioner.  Plaintiff appealed the decision to the Corrections Complaint Examiner, who recommended dismissal with the modification.  The Secretary accepted the recommendation.

### 4. Complaint OSCI-2006-32435

On November 3, 2006, plaintiff submitted Offender Complaint OSCI-2006-32435, complaining that his appointment on October 27, 2006 for "chronic pain and other serious medical issues was never finished but only to be quickly diagnosed a pimple as MERCER [he probably meant to say MRSA (methicillin-resistant staphylococcus aureus0 and quickly moved me into isolation putting me at risk."  He added that he needed to see the doctor for his chronic pain as soon as possible.

Defendant Delvaux investigated the complaint and found that plaintiff had been re-scheduled for an appointment with the doctor; she recommended dismissal of OSCI-2006-

20

32435.  Her recommendation was accepted by defendant Voermans, who dismissed the complaint on November 8, 2006.  Plaintiff appealed the decision; it was dismissed by the Secretary on November 13, 2006.

### 5. Complaint OSCI-2006-32969

Plaintiff submitted Offender Complaint OSCI-2006-32969 on November 8, 2006, complaining of the refusal to provide medical treatment for his chronic pain.  Dr. Lemke told defendant Delvaux that plaintiff had been seen several times for infections and had not reported any pain.  Delvaux advised plaintiff that he should take his complaints of inadequate medication to defendant Lemke and that he had an appointment scheduled for his pain.  She recommended dismissal; her recommendation was accepted by defendant Voermans, who dismissed plaintiff's complaint on November 17, 2006.  Her decision was upheld on appeal.

### 6. Complaint OSCI-2006-37046

Plaintiff submitted Offender Complaint OSCI-2006-37046 on December 18, 2006, complaining that an unlicensed medical staff member at the OSCI health services unit had discontinued the medications for plaintiff's medical condition.  This complaint was rejected on the ground that plaintiff had not alleged sufficient facts to support redress.  The reviewing

21

authority found that rejection of the complaint was proper.

On September 29, 2006, plaintiff filed a Petition for Supervisory Writ in the Wisconsin Supreme Court against defendant Lemke and Edwards. Plaintiff sought to have the court order immediate medical relief and proper medical care for him.

### E. Status of Medical Providers

Defendant Greer does not intervene in investigations carried out within an institution unless he is called upon to do so or he becomes aware of a serious risk to the health or safety of an inmate. Neither defendant Edwards nor defendant Greer has any involvement in determining the treatment an inmate receives for a specific condition. Because neither is a physican, neither can override the treatment decisions of physicians, prescribe medications or override a physician's decision to prescribe a medication or refuse to do so. Neither has any involvement in deciding whether to make an outside referral for an inmate. Defendant Edwards did not create or enforce any custom, policy or practice at Oshkosh that governed the pain medication an inmate could receive. Defendant Greer was never involved in any decisions concerning any treatment plans, programs or other decisions relating to plaintiff's medical condition.

Neither defendant Delvaux nor defendant Voermans has the authority to reverse an order of a nurse practitioner or physician. Defendant Delvaux has no independent ability

22

to evaluate the adequacy of an inmate's medical treatment but must rely on the professional opinion of medical providers.

### F. Prescription of Medicine to Inmates

The Department of Corrections Drug Formulary is the general guideline for prescribing medication to inmates. All doctors in the department are expected to have knowledge of the formulary. The department has no formal policy with respect to the treatment of chronic pain syndrome, but does have chronic pain management guidelines that it has reviewed with the staff physicians, together with guidelines on handling chronic pain promulgated by a task force of the Wisconsin Medical Society. The formulary contains medications that can help with pain, including methadone, oxycodone, oxycodone/acetaminophen, gabapentin and piroxicam. Doctors try to limit the use of short-acting opioids such as morphine, oxycodone and codeine in the correctional setting because of the high potential for abuse. Generally, the drugs are prescribed for acute pain or after surgery and for a week or less.

Long-acting opioids will stay in a patient's system for a longer period of time, if taken separately. They provide a steady twelve to twenty-four hour time-released supply of pain relief. Examples include methadone, oxycontin and MS [morphine sulphate] Contin. These drugs are prescribed for terminal diseases and chronic pain conditions. They present some

danger of overdose if snorted, crushed in the mouth and swallowed or taken in combination with short-acting opiods.  In addition, their side effects include sedation, constipation and respiratory depression.  Because their benefits wear off over time, patients need increasingly greater amounts to achieve the same level of pain control.  Tylenol, ibuprofen, aspirin, gabapentin and elavil can be equally effective pain relievers with less potential for abuse and dependency.

Inmates in a prison setting often have substance abuse problems, making it necessary for doctors to use caution in prescribing opiates.  The Department of Corrections does not tell the medical staff how to use prescription opioids in the treatment of pain, but leaves it up to the staff's professional judgment.

## G. Health Services Requests

When inmates enter a correctional institution they are given an inmate handbook informing them of the ways in which they may obtain medical attention.  For non-emergency attention, they are to submit a health services request to the health service unit. For emergency situations, they are to alert staff to their problem.

When plaintiff first entered the Oshkosh facility on or about November 22, 2005, he filled out a health service request, saying that he had unmanageable pain and needed to see a doctor.  He submitted a second request on or about November 29, saying that he

24

needed a pillow wedge and egg crate mattress for comfort because of his chronic pain. Someone from the medical staff responded to him on or about November 30, 2005, saying that a doctor had been asked to evaluate plaintiff's special needs.

On January 13, 2006, plaintiff filed another health service request, asking to see Dr. Kaplan because his stomach was bleeding as a result of taking the ibuprofen the doctor had prescribed. Donna Larson responded to the request, saying that plaintiff had seen the doctor on January 6, at which time he had decreased plaintiff's vicodin to one tablet daily for a week and none after that and prescribed ibuprofen. She noted that a follow-up appointment was scheduled for April.

On or about January 15, 2006, plaintiff wrote another health service request, asking to see a doctor, complaining of "horrible" pain and saying that he had suffered 13 rib fractures and two slipped discs among other injuries in his 2003 automobile accident. On or about January 16, he completed another request for a doctor's appointment, asking why he could not get treatment for his broken back and neck and two slipped discs. On January 22, he wrote again, saying "4th Request, still no doctor."

On April 12, 2006, plaintiff sent a health service request asking about the appointment that had been scheduled for April 6. In response, a member of the medical staff wrote him to say that no doctor had been at the institution since April 4, so plaintiff's appointment had been rescheduled.

25

On or about May 1, 2006, plaintiff wrote a health service request, complaining of a virus that had given him loose stools, dehydration, constant fatigue, weakness and headaches as well as the lack of attention to his chronic pain.  On or about May 20, 2006, plaintiff submitted another request, complaining of headaches, chills, fatigue, constant diarrhea and a lesion on his ring finger.  On or about July 18, 2006, plaintiff sent a request complaining of migraine headaches starting from his dislocated shoulder.

On August 11, 2006, plaintiff submitted a health service request, complaining that he was in horrific pain and that ibuprofen did nothing but tear up his liver.  Also on August 11, plaintiff wrote a letter to defendant Greer, complaining that he had not been treated properly at Oshkosh.

On September 11, 2006, defendant Edwards (manager of the health services unit at Oshkosh) received a letter from plaintiff, stating that he was in pain and did not believe he was receiving appropriate medical attention from defendant Lemke.  Edwards wrote plaintiff, telling him that Lemke was the one physician assigned to Oshkosh and that plaintiff should work with her and follow her treatment instructions.  It is Edwards's practice to review the medical file of any inmate who files a complaint about medical care and then inform the physician of the inmate's complaint.

On September 25, 2006, plaintiff was seen by the health services unit staff for complaints of having glass in his head that came out frequently after his 2003 automobile

accident. He alleged that his friends had helped him remove the glass. Staff noted a few red spots, checked to make sure no foreign bodies were present and found no objective evidence of glass.

On October 14, 2006, plaintiff was seen by a health services unit staff nurse for complaints of dark urine.

Defendant Edwards received a letter from plaintiff dated April 20, 2007, asking for treatment from an orthopedic surgeon for his chronic pain. Edwards arranged for plaintiff to have an appointment with a physician on April 24, 2007, to discuss his request. (Only a physician can make an outside referral.) Edwards received another letter from plaintiff, also on April 20, asking for an appointment with an outside pain specialist. Again, Edwards told plaintiff to talk to Dr. Lemke about his request because Edwards had no authority to make referrals.

PRELIMINARY INJUNCTION HEARING FACTS

A. Plaintiff's Testimony

At the time of the hearing, plaintiff was an inmate of the Jackson Correctional Institution, newly-arrived from the Green Bay Correctional Institution. He testified at the hearing that he is in constant pain throughout his whole body, especially his back, lower back and neck. Walking, sitting and working at his job cause him pain. Even walking to the

27

health services unit to get his medicine three times a day is hard for him.  When he is in particular pain, he lies down and rests.  He has gained almost 100 pounds since being incarcerated because of the pain he experiences when he tries to exercise.  He is taking gabapentin, which relieves his aching and stiffness but not his pain.

Plaintiff testified that the injuries he sustained in the October 2003 automobile accident included a shattered right ankle, a snapped right hamstring, a snapped right bicep, a dislocated shoulder, multiple rib fractures, collapsed lungs, breaks in his back and neck in two places and his coccyx bone.  He stated that the physicians at the University of Wisconsin Hospitals referred him to Dr. Demasco Ty, a pain specialist who worked with plaintiff on a biweekly basis from the fall of 2004 until his incarceration in February 2005.  According to plaintiff, Demasco Ty gave him multiple tests, checking his vision and treating his fainting spells and diagnosed him with chronic pain syndrome, for which he prescribed 500 mg. of Percocet four times a day.

Plaintiff testified that he signed medical releases when he went into state custody, including one for Demasco Ty's records.  He was prescribed amitriptyline when he first arrived, but it was ineffective for his pain and gave him mood swings.

When plaintiff was placed at the Kettle Moraine Correctional Institution, he was seen by Dr. Horn, who prescribed vicodin, cardiac medication and medication for his ulcers. From Kettle Moraine, plaintiff was transferred to the Oshkosh Correctional Institution,

28

where he saw Drs. Kaplan and Lemke and was prescribed ibuprofen but no pain medication. He testified that the ibuprofen caused his stomach to bleed.

## B. Pain Specialists

### 1. Marco Araujo, M.D.

In January 2008, at the request of plaintiff's attorneys, he saw Dr. Marco Araujo, a private pain specialist in Green Bay. Dr. Araujo examined plaintiff at the Green Bay Correctional Institution. Before doing so, he reviewed hospital records, documents from a pain clinic and records from the Department of Corrections. Following the examination, he asked for x-rays of plaintiff's cervical, thoracic and lumbar spine, as well as an MRI of the cervical spine, and reviewed the results.

It is Araujo's opinion that plaintiff's pain symptoms are the consequence of the bilateral L5 vertebral pedicle fractures. Aruajo noted that the cervical spine MRI did not reveal any nerve root impingement or nerve forminal stenosis that could be the cause of his plaintiff's shoulder and arm pain, although there was some sign of disc dessication and mild degenerative disc disease at the C5 and 6 discs that might cause some mild pain. In addition, the x-rays showed some mild degenerative facet joint disease, "worse at the C2 odontoid location," tr. prelim. inj. hrg., dkt. #30, at 116, that Araujo believed could cause some degree of pain. Araujo surmised that any shoulder pain plaintiff might be experiencing

29

would come from his rotator cuff repair and associated scar tissue at his neck, because the degeneration of the discs and joints was too mild to be the likely cause of the pain. The thoracic (mid) spine showed a more advanced degree of degeneration of the discs, making it more likely that it was causing plaintiff pain. Araujo would consider thoracic epidural steroid injections to reduce the pain in this area. In determining whether plaintiff was experiencing pain during the examination, Araujo ran his fingers lightly over a particular area of plaintiff's body and watched to see whether plaintiff grimaced at the touch.

The x-rays of plaintiff's lumbar spine revealed mild degenerative disc disease at the L5-S1 area. Again, Araujo believed that injections might be helpful for the pain plaintiff was experiencing in this part of his spine.

Araujo's recommendations included injections, physical therapy, gabapentine or topiramate and a low dose of methadone. He does not believe that ibuprofen is advisable for long-term care.


2. Sara Holz, M.D.

In March 2005, plaintiff saw Dr. Sara Holz, a physician at the University of Wisconsin specializing in physical medicine and rehabilitation. Her research focus is on chronic pain problems, particularly those involving the spine. In the report of her examination of plaintiff, Holz described him as having limited range of motion in his

30

lumbar, thoracic and cervical spine, pain when he tried to move his hip and limited range of motion in abduction, internal and external rotation, weakness of elbow flexion and extension and slight weakness of internal and external rotation of his shoulder and possible signs of impingement.  His MRI showed "very mild degenerative disc disease but flattening of the cervical lordosis."  Tr., prelim. inj. hrg, dkt. #130, at 81.  Plaintiff reported "left-sided neck pain with tingling in the fourth and fifth digits on the left side," id. at 94, and irritable bowel syndrome.  Id. at 95.

Holz's recommendation in March 2008 was physical therapy, an increase in plaintiff's dosage of gabapentin to 900 milligrams three times a day to treat his neuropathic pain condition and consideration of methadone at five milligrams twice a day for a week, increasing to five milligrams three times a day.  At the time she made this recommendation she was aware that plaintiff was an inmate and that he had used alcohol and narcotics in the past.  She also recommended that plaintiff have an MRI of his lumbar spine and EMG of the left upper extremity.

## C. Dr. Richard Heidorn

Plaintiff was transferred from Oshkosh to the Green Bay Correctional Institution, where he was treated by Dr. Richard Heidorn.  Heidorn refused plaintiff's requests for both hydrocodone and methadone, believing that neither medication would be appropriate for

31

plaintiff.  In reaching this decision, Heidorn relied on x-rays and his observations of plaintiff, who appeared to be far less disabled when he was not under direct observation in the health services unit.  For instance, he had a much less pronounced limp when he was walking away from the unit than he did while in the unit.  Outside the unit, he appeared to be able to move all his extremities easily.  Heidorn prescribed piroxicam, which, plaintiff says, caused his stomach to bleed.  Heidorn discontinued the medication after twenty days.  At some time Heidorn prescribed gabapentin and tried unsuccessfully to persuade defendant to exercise on a nonimpact light exercise machine known as a gazelle.

It is Heidorn's opinion that plaintiff suffers from chronic pain syndrome, which Heidorn views as  consisting of anxiety, depression, anger and varying degrees of disability. He would treat it at the outset with exercise, weight loss and an analgesic.  He might add a nonsteroidal anti-inflammatory and progress to neuromodulators and antidepressants and, as a last resort, an opiate of one or another form.  He was not prepared to prescribe an opiate to plaintiff before trying the other forms of treatment.

D.  Kenneth Adler, M.D.

Shortly after seeing Dr. Holz in March 2008, plaintiff was moved from Green Bay to the Jackson Correctional Institution, where he was examined upon arrival by Dr. Kenneth Adler, a staff physician at the institution.  Adler noted that although plaintiff reported that

32

he was not able to function well after his 2003 automobile accident, he had listed bow and gun hunting and fishing as activities in which he engaged after his accident. When Adler questioned him about the hunting, he said he had used a cross bow.

Plaintiff told Adler that his entire left arm and all the fingers of his left hand were tingling and numb. Adler found this significant in light of Holz's notes to the effect that plaintiff had complained of numbness and tingling in only his fourth and fifth fingers of his left hand. Plaintiff told Adler that he had minimal if any pain radiating down to his legs from his back pain, which indicated to Adler that he did not have any nerve impingement in his spine.

Throughout the examination, plaintiff shifted positions and breathed heavily, suggesting that he was in pain. Adler administered certain tests to plaintiff to see whether he exhibited "Waddell's signs," that is, behavior indicating faking or embellishment of pain. For example, Adler had plaintiff stand up and then placed his hands on the top of plaintiff's head and pushed down. Plaintiff responded that he was in pain. According to Adler, it is physically impossible to experience significant pain in the lower back as a result of pressure on the top of the head. Adler had plaintiff stand again and took him by the hips and turned him while keeping his shoulders aligned with his hips. Although he kept plaintiff's back straight and his shoulders over his hips, plaintiff grimaced and acted as if he were experiencing significant pain carrying out the maneuver. Again, according to Adler's

33

understanding of Waddell's signs, this is physically impossible.

Adler tried a third test, which involved raising plaintiff's legs less than about 20 degrees while plaintiff was lying on the examination table.  Plaintiff's reaction was one of pain, despite the fact that before he lay down, he sat on the table with his legs straight out before him, suggesting that having his legs at a 90 degree angle to his trunk was something he could handle easily and without pain.  At one point while plaintiff was talking, Adler noted that he shrugged his shoulders.  Less than a minute later, Adler rested his hands on plaintiff's shoulders and asked him to raise them.  Plaintiff raised only his right shoulder and made no effort with the left one.  Adler believed this was evidence of malingering.

Adler tested plaintiff's touch sensation in his fingers with a piece of string; plaintiff said he felt nothing at all.  Yet after plaintiff left the office, Adler observed him walk down the hallway, bracing himself with one arm and using the other to brace himself on the walls, which was inconsistent with his assertion that he had no feeling at all in his left hand.

Adler had plaintiff take off his shoes and socks and put them on again.  He did this easily, rotating his hips 90 percent to rest one leg across the thigh of the other.  Yet when Adler tried to rotate plaintiff's right hip 30 degrees while he was sitting on the table, he grimaced with pain.  At the end, plaintiff complained of too much pain in his knees to allow Adler to undertake a thorough examination.

Adler's assessment was that plaintiff met the criteria for nonorganic low back pain

34

syndrome, that the symptoms of his shoulder pain varied considerably from the report plaintiff had given Dr. Holz, that he had refused to allow an examination of his knees and that his shoulder shrug was inconsistent with left shoulder pain.  He concluded that the variability of plaintiff's behavior and his pain complaints suggested malingering or embellishment of pain.

### E. Video

While plaintiff was at the Green Bay prison, he was told he was about to be moved to another institution and was to pack his belongings immediately.  Unbeknownst to plaintiff, he was videotaped while he was packing.  On the tape, he was bending forward from the waist, walking without apparent difficulty and reaching for objects, although all of these are activities he testified are beyond his abilities.  He did not exhibit any signs of distress or symptoms of severe pain.

After watching the video of plaintiff at Green Bay and seeing plaintiff moving in ways he had not been when he was in her office, Dr. Holz testified that she would possibly change her recommendation to delete the methadone prescription.  Plaintiff's behaviors in the video were inconsistent with the behaviors he exhibited in her office, such as bending under things, laughing, bending to pick up things and maintaining a flexed position (bending forward at about a 45 degree angle).

35

On the other hand, Dr. Araujo testified that he had watched 10-15 minutes of the video of plaintiff and it did not change his opinions about plaintiff's pain or his need for medication.

## F. Hunting Licenses

Diane Crawford is information systems manager for the Department of Natural Resources, where she manages the hunting and fishing licensing database.  The database includes all persons who have purchased any type of hunting and fishing license or park pass since the system was implemented in 1999.  It shows that on October 1, 2004, plaintiff purchased a small game license, an archery license and an exterior goose permit, as well as a waterfowl stamp.  The archery license he bought allows a person to hunt deer and other species with a bow; it does not allow use of a cross bow.  Permission to use a cross bow requires a doctor's certification and a disabled permit.  Had plaintiff obtained such a permit, it would have been recorded on the database.

## G. Plaintiff's Credibility.

While plaintiff was at the Oshkosh Correctional Institution, he was disciplined for receiving smuggled tobacco products and spent six months in segregation before he was transferred to the Green Bay prison.

36

Plaintiff admitted at the hearing that he made a mistake when he told prison authorities that he had shattered his legs in the October 2003 accident.  He has said on occasion that he shattered his ankle; in fact, he broke his ankle and did not have a plate inserted.  He also said that he sustained fractions in T3 through T9 of his spine but he is not sure whether this is true.  In at least one offender complaint and numerous health service requests that he filed with the prison, he said he had suffered fractures in his neck and back in C2 through T9.  No doctor has confirmed that he suffered such fractures.

OPINION

I. MOTION FOR SUMMARY JUDGMENT

Plaintiff's appointed counsel filed a first amended complaint on September 9, 2007, changing the scope of plaintiff's asserted claims against defendants.  After the complaint was screened, the following claims remained.  Defendant Timothy Correll had forced plaintiff to wear work boots rather than sneakers and failed to treat plaintiff's atrial fibrillation and severe pain. Defendant Roman Kaplan failed to treat plaintiff's pain adequately. Defendant Nancy Bowens disregarded plaintiff's plea for increased pain medication for the purpose of causing him to suffer needlessly.  Defendant Deb Lemke canceled an appointment plaintiff had made to discuss his pain, instead isolating him in a separate cell with an inmate who had a contagious disease, in retaliation for plaintiff's having filed a petition for a writ against her.

37

In addition, she failed to treat his pain adequately, failed to provide him with an extra pillow and intentionally included false information in his medical file for the purpose of interfering with his treatment.  Defendants James Greer and Thomas Edwards have a policy of refusing to treat a prisoner's pain with anything except ibuprofen and naproxen and defendant Edwards refused to treat plaintiff's pain in September 2006 and in February 2007. Defendant Jennifer Delvaux and Patricia Voermans turned a blind eye to plaintiff's pleas for intervention to obtain medical assistance on his behalf.

## A. Background

It is well established that the government must provide adequate medical care to the prisoners in its custody.  Estelle v. Gamble, 429 U.S. 97, 103 (1976).  To do otherwise is to violate the prisoners' rights under the Eighth Amendment.  This does not mean, however, that negligence on the part of a medical provider amounts to a violation of the Eighth Amendment.  Negligent medical care is grist for the state court's mills; it will not support a federal constitutional claim.  Rather, according to the Supreme Court, "a prisoner must allege acts or omissions sufficiently harmful to evidence *deliberate indifference* to serious medical needs."  Id. at 106 (emphasis added).  "The test for deliberate indifference is a subjective one:  The official must 'both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'"

Sain v. Wood, 512 F.3d 886, 894 (7th Cir. 2008) (quoting Farmer v, Brennan, 511 U.S. 825, 837 (1994)).

As should be obvious from the "deliberate indifference" standard, governmental officials and employees are not required to provide the exact medical care an inmate requests. Medical providers may rely on their own professional judgment in responding to inmate requests and medical needs. The possibility that another medical professional would disagree with the provider's response does not mean that the response is evidence of deliberate indifference. "A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" Sain, 512 F.3d 894-95 (quoting Collignon v. Milwaukee County, 163 F.3d 982, 988 (7th Cir.1998)). The general rule is that a medical professional displays deliberate indifference only if "'the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" Collignon, 163 F.3d at 988 (quoting Youngberg v. Romeo, 457 U.S. 307, 322-23, (1982)).

## B. Dr. Correll, M.D.

To prevail on his contention that Dr. Correll violated plaintiff's Eighth Amendment rights, plaintiff would have to prove that Correll knew that plaintiff would experience severe

pain if required to wear work boots and that the pain could have been avoided had plaintiff been permitted to wear sneakers. Also, plaintiff would have to prove that Correll knew that plaintiff was suffering from an irregular heartbeat or other kind of heart condition and failed to treat it, thereby causing the condition to worsen or causing plaintiff unnecessary pain or both. On both points, the record is devoid of any evidence that Correll knew of either problem.

Correll prescribed sneakers for plaintiff at the outset because he was under the mistaken impression that plaintiff was HIV positive. When he learned later that this was not true and canceled the order, plaintiff never told him that the work boots caused him pain. Plaintiff cannot expect Correll to know about his feet if plaintiff never tells him. Merely knowing that plaintiff had suffered a broken ankle in the past would not have alerted him. In fact, Correll believes that a person who has suffered a broken ankle would do better in work boots than in sneakers because the boots provide better support (and greater comfort) for such a person. No reasonable jury could find that Correll was negligent in these respects, much less that he was deliberately indifferent to any severe pain that plaintiff was suffering.

Plaintiff never told Correll that he suffered from a heart condition or specifically that he was suffering from an irregular heartbeat. All he said on the health transfer summary he completed upon admission to Dodge Correctional Institution was that he was on heart

40

medication.  Again, without proof that he knew that plaintiff had a problem, Correll cannot
be found to have been deliberately indifferent to that problem.


## C. Roman Kaplan, M.D.

To prove that Dr. Kaplan was deliberately indifferent to his serious pain, plaintiff
would have to show that he was in severe pain, that Kaplan knew this and deliberately
refused to provide plaintiff the treatment that even a minimally competent physician would
have provided.  Plaintiff has not made this showing.

Plaintiff saw Kaplan for the first time on January 5, 2006.  Kaplan found that plaintiff
had a history of paroxysmal atrial fibrillation.  He checked plaintiff's heart, which he found
to be normal, and his heartbeat, which was regular with no murmurs.  His examination of
plaintiff's ability to move revealed few objective findings to support plaintiff's complaints
of severe pain.  He ordered a gradual reduction in plaintiff's use of vicodin, with the
medication to be phased out in a week, believing it unnecessary and concerned that plaintiff
might be abusing it.  At the same time, he counseled plaintiff on steps he could take to
accommodate his pain and he ordered a lower bunk, mattress, extra pillow and 800 mg.
ibuprofen twice a day as needed for a year.

Plaintiff maintains that he was in pain and had difficulty moving during his
examination, implying that Kaplan lied when he made out the medical records and when he

41

swore to his affidavit.  Assuming as I must when deciding a motion for summary judgment that plaintiff is telling the truth about the extent of pain and disability he was experiencing, it does not follow that Kaplan's response was blatantly inappropriate, that is, deliberately indifferent.  Plaintiff has adduced no evidence from which a jury could find that when dealing with a person complaining of chronic pain, it would constitute deliberate indifference (or even negligence) to try to wean the person off opioids, substitute nonsteroidal prescriptions such as ibuprofen and provide accommodations such as extra pillows, a mattress and a lower bunk.

Although plaintiff says that the ibuprofen prescription was a bad choice for someone with an ulcerated stomach, he has adduced no proof that he ever suffered from this condition before or after he entered the prison.  (It is disputed whether he told Kaplan about the problem; I will assume for purposes of deciding this motion that he did.)  About one week after seeing Kaplan, he filed a health service request complaining that the ibuprofen was causing his stomach to bleed, but he never mentioned the bleeding or any gastrointestinal problem in any health service request again until August, although he filed at least five requests in the interim.  When plaintiff saw defendant Bowens in February 2006, about one month after seeing Dr. Kaplan, he told her he had intermittent traces of blood in his stool and gastrointestinal changes but no abdominal pain.  She tested him for hidden gastrointestinal bleeding; the test was negative.  Plaintiff did not tell her that the

ibuprofen he was taking was irritating his stomach.

No reasonable jury could find from the undisputed facts that Kaplan acted with deliberate disregard for any serious medical harm that plaintiff was experiencing.

### D. Nancy Bowens, A.P.N.P.

Defendant Nancy Bowens is alleged to have disregarded plaintiff's plea for increased pain medication for the purpose of causing him to suffer needlessly. It is disputed whether plaintiff made her aware of his severe pain during the times she saw him. She never noted any complaints about pain in his medical chart, but he has stated in his declaration that he told her about it on several occasions. In addition, it is undisputed that he sent her a health service request, complaining of his pain, to which she responded by saying that he was scheduled for an appointment with the doctor and had just had his ibuprofen prescription reinstated and should give the ibuprofen a chance to work. This response does not demonstrate deliberate indifference.

Plaintiff makes no real argument to support his contention that defendant Bowens was deliberately indifferent to his requests for increased pain medication, other than to assert that she told him that he would not receive any pain medication at Oshkosh unless he was on the floor, yelling "bloody murder." If true, her comment might have been unkind, but it is not evidence of deliberate indifference in and of itself.

43

Defendants have submitted evidence that plaintiff did not suffer from severe pain and that even if he did, opioids are inadvisable for long term treatment. Plaintiff has adduced no evidence that defendant Bowens's refusal to increase his pain medication was a manifestation of deliberate indifference to his serious medical needs.

### E. Dr. Deborah Lemke, M.D.

Defendant Deb Lemke is alleged to have canceled an appointment plaintiff had made to discuss his pain, instead isolating him in a separate cell with an inmate who had a contagious disease, in retaliation for plaintiff's having filed a petition for a writ against her. In addition, she is alleged to have failed to treat his pain adequately, failed to provide with an extra pillow and intentionally included false information in his medical file for the purpose of interfering with his treatment.

The undisputed facts show that plaintiff had a pimple or cyst on his back in October 2006 and that he consulted Dr. Lemke about it. She believed that it might indicate MRSA and implemented the MRSA protocol. Whether she knew at the time that plaintiff had filed a writ against her (her knowledge is disputed), plaintiff cannot show that she acted improperly in implementing the protocol. Although he contends that it was retaliatory for her to place him in a cell with an infected inmate, it is undisputed that no other isolation cells were available. In any event, plaintiff never contracted MRSA so he has no ground for

44

a claim on this issue.

As for defendant Lemke's alleged failure to treat plaintiff's chronic pain adequately, the undisputed facts show that defendant Lemke acted according to her best medical judgment. She was concerned that plaintiff might be misrepresenting his pain, given his history of alcohol and drug abuse and his general lack of credibility. Moreover, she observed that he walked normally and in a relaxed manner when he left her office and displayed no evidence of chronic pain. In that circumstance, prescribing pain medication would have been medically inappropriate. It was not deliberate indifference.

Although plaintiff alleged that defendant Lemke put false information into his medical records and this information interfered with his medical treatment, he adduced no evidence in support of this allegation. Apparently, he is referring to Lemke's statement in the records that plaintiff is not to be believed because, in her opinion, he lied about his HIV status, about the date of his accident and about his treatment by Dr. Demasco Ty. Plaintiff denies that he ever told Lemke he had HIV or that he told her his accident was only 18 months earlier rather than 18 months before he was incarcerated. The medical record submitted to the court include a record of treatment by Dr. Demasco Ty. Dr. Lemke denies having found that information in the record when she reviewed it but for the purpose of deciding this motion, I must assume that the information was there and also that plaintiff is correct about what he told Lemke.

45

The disputes are immaterial because the allegedly false information was never shown to have influenced defendant Edwards's treatment decisions with respect to plaintiff. As explaining in the succeeding section, Edwards responded appropriately to two health services requests sent to him by plaintiff. Even if Lemke put false information into the records, plaintiff has not shown that it had any deleterious effect on him.

### E. James Greer and Thomas Edwards

The undisputed facts show that the Department of Corrections does not have a policy of refusing to prescribe medications other than ibuprofen or naproxen when treating a prisoner's pain. Plaintiff cannot prove his contention that defendants Edwards and Greer were deliberately indifferent to his suffering because they implemented a department policy denying the prescription of pain medications stronger than ibuprofen or naproxen. Defendants' motion for summary judgment will be granted as to this claim.

As to plaintiff's other claims against Edwards, the undisputed facts show that Edwards responded appropriately to plaintiff's September 2006 and April 2007 requests and within the scope of his authority. In the September 2006 incident, plaintiff complained about Dr. Lemke; Edwards responded that she was the only physician in the institution and that plaintiff should try to work with her. Plaintiff argues that Edwards had an obligation to tell higher ranking officials in the department about plaintiff's problems but he has shown no

46

reason why this would be true.

One might imagine a situation in which inmate care was so obviously lacking and the inmate so obviously in severe straits that a person in Edwards's position would have some obligation to arrange for intervention.  That is not the situation that Edwards faced. Plaintiff was being seen by health services staff.  The fact that he persisted in complaining does not mean he was not receiving appropriate care.

Apparently in February 2007, plaintiff met with Edwards on several occasions, complaining of inadequate care.  In two written requests sent to Edwards in April 2007, plaintiff referred to the February visits and asked Edwards to arrange an appointment with an orthopedic surgeon to evaluate plaintiff's chronic pain.  Edwards responded by arranging an appointment with Dr. Lemke at which plaintiff could discuss his request.  Plaintiff may wish that Edwards had done more for him but he has failed to prove that Edwards was deliberately indifferent to any serious medical need.

### F. Jennifer Delvaux and Patricia Voermans

Defendant Jennifer Delvaux and Patricia Voermans are each alleged to have turned a blind eye to plaintiff's pleas for intervention to obtain medical assistance on his behalf. However, as defendants note, unless the medical defendants can be held to have been deliberately indifferent to serious medical needs of plaintiff, defendants Delvaux and

Voermans cannot be found to be deliberately indifferent for dismissing plaintiff's complaints. Plaintiff has not alleged that either of these two defendants failed to comply with their duty to treat inmate complaints properly.

The undisputed facts show that defendant Delvaux investigated each of plaintiff's complaints and insured that he was being seen by the health services staff and that the staff was aware of his complaints. In one instance, her review of a complaint unearthed an error in plaintiff's dosage of ibuprofen; the error was corrected immediately. The only complaint that was not investigated was one in which plaintiff alleged that an unlicensed staff member was refusing to treat his chronic pain; it was rejected because plaintiff had not alleged sufficient facts to permit investigation and remedy. Plaintiff has not shown that this was an error, let alone evidence of deliberate indifference to any serious medical needs.

Voermans's job is limited to reviewing Delvaux's work. Plaintiff has proposed no facts to suggest that she did not conduct the reviews properly.

Defendants' motion for summary judgment will be denied as to plaintiff's claims against defendants Delvaux and Voermans because he has not shown any reason for finding these defendants liable to him on his Eighth Amendment claim.


## II. PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Now that I have concluded that defendants are entitled to judgment in their favor on

their motion for summary judgment, it is unnecessary to say much if anything about plaintiff's motion for a preliminary injunction. However, the evidence adduced at the hearing supports my conclusion to grant defendants' motion. Although needless pain and suffering resulting from the deliberately indifferent withholding of medical care would violate the Constitution, Gutierrez v. Peters, 111 F.3d 1364,1371 (7th Cir. 1997), plaintiff's assertion of serious pain is not credible enough to support a finding that he is actually in such pain.

It is not disputed that plaintiff was injured in an automobile accident in 2003 or that he has some mild and moderate degenerative disease in his facet joint and thoracic spine and fractures of his bilateral L5 vertebral pedicles. Whether the degenerative disease or fractures or both cause him severe pain is a question only plaintiff can answer and his testimony on that point is not believable. Dr. Adler's testing exposed the implausibility of plaintiff's claims. The video of his movements at the prison further undermined those claims, as did the evidence that less than a year after his accident, he applied for an archery license to hunt deer. Taking together plaintiff's history of drunk driving convictions; his effort to smuggle tobacco into the prison; the varying versions he has given of the injuries he suffered in the accident; the misleading reports he has made to institution staff and the state court about his HIV status, heart problems, stomach bleeding and intestinal disorders; and his relentless efforts to obtain pain medication, it is hard to avoid the conclusion that his desire for opiates

49

is fueled by something other than severe pain.

Even if plaintiff could make a credible showing of severe pain, however, he cannot overcome the evidence rebutting any proof of deliberate indifference on the part of defendants. The record shows that plaintiff has been seen on repeated occasions by nurses, nurse practitioners and doctors working in the various institutions in which he has been housed. Although plaintiff does not believe that he has been able to see medical staff as often as he would like or that staff have responded appropriately to his requests for stronger pain medication, his frustration with defendants' responses does not establish deliberate indifference.

A medical professional's disagreement with a patient about treatment is not deliberate indifference unless "no minimally competent professional would have so responded under those circumstances." <u>Sain v. Wood</u>, 512 F.3d 8886, 894 (7th Cir. 2008). Plaintiff has adduced no evidence to show that the professionals that treated him or declined to do so acted below the minimal standards of competence. The only evidence he has submitted is that Dr. Araujo, a pain specialist, testified that he would recommend methadone for plaintiff and that a second pain specialist, Dr. Holz, testified that she would consider prescribing methadone for plaintiff. However, neither doctor said that plaintiff required methadone or that no minimally competent physician would refuse to prescribe it.

Neither Araujo nor Holz had the opportunity to observe plaintiff when he was not

aware of being watched.  When Holz saw the video, she testified that she might change her methadone recommendation.  Araujo watched the same video and said he would not change his recommendation.  This difference of opinion between two qualified pain specialists is strong evidence that the defendant medical providers' decision not to prescribe methadone for plaintiff was not below the standard of minimal competence.  Therefore, it cannot be deliberate indifference.

ORDER

IT IS ORDERED that

1. Defendant William Pollard is DISMISSED from the case with prejudice on plaintiff's motion;

2. The motion for summary judgment filed by defendants James Greer, Timothy Correll, M.D., Deb Lemke, M.D.,  Roman Y. Kaplan, M.D., Nancy Bowens, A.P.N.P., Jennifer Delvaux, Thomas Edwards and Patricia Voermans is GRANTED; and

3. Plaintiff Patrick J. Fitzgerald's motion for a preliminary injunction is DENIED.

51

The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 12th day of June, 2008.

BY THE COURT:

___/s/_____
BARBARA B. CRABB
District Judge